RICHARD E. AKERS and PEGGY H. AKERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN D. HAMRICK and MARY W. HAMRICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Akers v. Commissioner
Docket Nos. 1038-80, 1039-80.
United States Tax Court
T.C. Memo 1981-627; 1981 Tax Ct. Memo LEXIS 122; 42 T.C.M. (CCH) 1548; T.C.M. (RIA) 81627; October 26, 1981. Robert E. Hauser and William E. Wheeler, for the petitioners. Dean F. Chatlain, for the respondent. NIMS
NIMS, Judge: These cases were consolidated for trial, briefing and decision by order of this Court. Respondent determined the following deficiencies in and additions to petitioners' 1976 income tax: Addition to Tax
Petitioners
Deficiency
Sec. 6653(a), I.R.C. 1954
Akers
$ 5,626.90
$ 335.90
Hamrick
5,227.80
261.39
*124 Due to concessions by the respondent the issues remaining for decision are: (1) whether an aircraft rental operation carried on by a partnership of Richard Akers and John Hamrick is an activity not engaged in for profit within the meaning of section 183; [1] and (2) whether petitioners may deduct under section 165(c) certain travel expenditures which were incurred in the search for a site for the operation of a waterslide amusement. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by reference. Petitioners resided in High Point, North Carolina, at the time the petitions in this case were filed. Aircraft Rental Operation
Petitioner Richard Akers is employed as a physician by the High Point Urology Clinic. Petitioner John Hamrick is a self-employed dentist in High Point, North Carolina. Drs. Akers and Hamrick have successful practices to which they devote most of their working hours. 1a
*125 On March 1, 1976, petitioners Drs. Akers and Hamrick formed a partnership concerning a 1972 Cessna C210L airplane (the "Cessna") which Dr. Akers had been leasing. A formal written partnership agreement was not executed by petitioners until January 16, 1980. However, they signed a written agreement regarding the Cessna aircraft on March 1, 1976. This agreement states that "[t]he primary purpose of the [partnership's] ownership of [a leasehold interest in] the airplane is to [sub-] lease it to customers for profit." From March 1, 1976, to September 28, 1976, the partnership rented the Cessna to Drs. Akers and Hamrick (in their individual capacity) and to third parties for an hourly rental. On September 28, 1976, the partnership exercised a purchase option on the Cessna aircraft. The purchase option was exercised so that the Cessna could be traded in toward the purchase of a Beechcraft V35B Bonanza aircraft (the "Bonanza"). An aircraft bill of sale showing the sale of the Bonanza to the partnership was issued on October 4, 1976. The partnership rented the Bonanza to petitioners and to third parties for an hourly rental during the remainder of 1976 and during 1977. *126 On January 1, 1978, the partnership entered a "leaseback" agreement with Air Service, Inc., which is one of the "fixed-base operators" in the Greensboro-High Point area. Under this arrangement, Air Service, Inc. secured customers to use the aircraft and paid the partnership an amount fixed by the agreement for each hour that the aircraft was used. In essence, Air Service, Inc. became the partnership's sole leasing agent. Air Service, Inc. used the aircraft in its air taxi business [2] and rented it to Drs. Akers and Hamrick. In December, 1978, the parntership sold the Beechcraft Bonanza and purchased a Beechcraft Baron (the "Baron"). The Baron was substituted in the leaseback arrangement with Air Service, Inc.
The partnership received rental income and reported net losses for the years 1976-1978 in the following amounts: 1976
1977
1978
Rental Income
$ 6,403.27
$ 13,495.00
$ 13,657.15
Net Losses
8,580.80
9,703.00
22,012.87
*127 Prior to the formation of the partnership, Drs. Akers and Hamrick were each licensed pilots fully qualified to fly the Cessna, the Bonanza and the Baron aircraft. The petitioners derive personal pleasure from flying. Dr. Hamrick is a vice-president and director of the Flying Dentist Association, which is an organization of dentists involved in aviation. Dr. Akers utilized the partnership aircraft for partnership business, personal business and personal pleasure. During the time period from March 1, 1976 to December 31, 1976, Dr. Akers flew 78.5 flight hours in the partnership aircraft, composed of the following categories of use: Partnership Business
4.5 Hours
Waterslide Business
12.5 Hours
Farm Business
29.2 Hours
Medical Business
2.9 Hours
Proficiency
21.4 Hours
Repair Travel
8.0 Hours
Dr. Hamrick utilized the partnership aircraft for partnership business, personal business and personal pleasure. During the time period from March 1, 1976 to December 31, 1976, Dr. Hamrick flew 106.6 flight hours in the partnership aircraft, composed of the following categories of use: Partnership Business
13.1 Hours
Waterslide Business
9.2 Hours
Dental Business
7.8 Hours
Flying Dentist Meetings
9.4 Hours
Repair Travel
1.8 Hours
Proficiency
26.7 Hours
Personal Travel
38.6 Hours
*128 Dr. Hamrick utilized the partnership airplane from June 26 to July 10, 1976, for personal travel to North Myrtle Beach, South Carolina, Hilton Head, South Carolina, Charleston, South carolina, and Sea Island, Georgia. During this trip, he utilized the airplane for 14 calendar days and was charged by the partnership for 4.1 flight hours. Petitioners Dr. Akers and Dr. Hamrick were charged for use of the partnership aircraft at the same rate charged to unrelated third parties. The partnership did not charge the petitioners for any use of the aircraft for partnership business travel and repair travel. The rates charged for rental of the partnership's aircraft were the prevailing rates charged by fixed-base operators and other private owners who rented similar airplanes. The partnership raised the rental rate, at least once, during 1976. The source of the partnership's rental income during the years 1976-1978 is as follows: 1976
1977
1978
Dr. Akers
$ 2,469.80
$ 4,700.00
$ 2,649.22
Dr. Hamrick
3,130.80
7,215.00
4,750.78
Third Parties
802.67
1,580.00
6,257.15
The partnership had its own checking account and, starting in 1977, its own business *129 cards, stationery and invoices. The partnership filed a separate return of income (Form 1065) for the short partnership year March 1 through December 31, 1976. The partnership did not have its own office or telephone number. The partnership was not listed in the telephone book. The partnership did no advertising beyond a limited number of personal contacts by petitioners. Petitioners spent minimal time marketing the partnership aircraft or engaging in other partnership business. The Cessna and the Bonanza were each single engine aircraft which carried six passengers, including the pilot. The Greensboro-High Point rental market for each of these aircraft was limited because their operation was complex and expensive. The rental customer for each of these aircraft would have to be a well qualified pilot. Thus, they were not well suited for rental use for flying lessons, which comprised a large part of the Greensboro-High Point rental market. The complexity and cost of operations renders the Cessna and the Bonanza better suited for air taxi operators than for a rental business. The use of an aircraft in air taxi operations is closely regulated by the Federal Aviation Administration. *130 There are very high operational standards regarding maintenance and operating procedures and personnel for air taxi operations. Extensive maintenance checks are required every 100 flight hours in an air taxi operation. Maintenance checks are required annually for aircraft leased to private individuals. Since the air taxi operator furnishes the pilot and airplane, the air taxi certificate granted by the Federal Aviation Administration is essentially a common carrier permit. The Beechcraft Bonanza aircraft is a faster airplane than the Cessna C210L. The Beechcraft Bonanza has better all-weather instrumentation, more sophisticated radios and a better autopilot than the Cessna C210L. These characteristics make the Beechcraft Bonanza safer to operate than the Cessna C210L. The Beechcraft Baron airplane is a twin engine craft. It is faster than either the Bonanza or the Cessna. Its electronics and navigation equipment are more sophisticated than either of the other partnership airplanes. Because of its speed and safety features it is desirable as an air taxi aircraft. Because of the complexity and expense of operation its rental market is very limited. The partnership leased *131 its aircraft based upon the number of flight hours used by the customer. The rental agreement did not require a guaranteed minimum usage for any period that the airplane was leased. Air Service, Inc. a fixed base operator in the Greensboro-High Point area, requires a guaranteed minimum amount of usage for rental airplanes owned by the corporation. Air Service, Inc., would object to renting a Beechcraft Bonanza owned by them if the customer was only going to use the airplane for 4.1 flight hours during a 14-day period. North Carolina National Bank financed a portion of the purchase price of the Beechcraft bonanza. The bank imposed no requirement that Drs. Akers and Hamrick rent the aircraft to generate sufficient revenues to help pay the mortgage on the aircraft. Dr. Hamrick is confident, based on his service as a bank director and member of a loan committee, that North Carolina National Bank would have loaned sufficient funds to purchase the Beechcraft bonanza based solely on petitioners' personal financial statements. Prior to formation of the partnership and during the period of partnership operations petitioners were in contact with individuals who were affiliated with the *132 fixed-base operators in the Greensboro-High Point area. Petitioners received information concerning potential rental revenues and expenses of various aircraft from these contacts. Air Services, Inc., and Atlantic Aero each recommended that the partnership's profitability would be increased if the partnership entered a leaseback arrangement with one of the fixed base operators because the fixed-base operators had a marketing capability which the partnership lacked. Waterslide Expenditures
During 1976, Drs. Akers and Hamrick decided to enter the waterslide amusement business. Petitioners investigated several sites before deciding to construct and to operate a waterslide near Wildwood, New Jersey. In 1977, they formed a corporation with several other individuals to carry out this business. Petitioners claimed a section 165(c) loss deduction for the investigation expenditures allocable to the sites which were not developed. Respondent disallowed this deduction. OPINION Aircraft Rental Operation
In March, 1976, petitioners established a partnership which rented an aircraft. Because expenses attributable to operation, housing and maintenance of the partnership *133 aircraft and the depreciation allowance exceeded gross rental income, petitioners deducted the resultant net loss on their income tax returns for 1976. In conjunction with the aircraft rental operations, petitioners also deducted an amount for section 179 additional depreciation and took a section 38 investment tax credit. Respondent determined that the aircraft rental operation was an activity not engaged in for profit and, consequently, determined that the deductions and credit are allowable only to the extent sanctioned by section 183. [3] We agree with respondent. *134 Ordinary and necessary expenses and depreciation attributable to an activity not engaged in for profit are deductible only to the extent of gross income derived from such activity, less the amount of the deductions which are allowable whether or not the activity is engaged in for profit. Section 183(b); section 1.183-1(b)(1), Income Tax Regs. A similar limitation applies to the section 179 deduction and the section 38 credit becaue the deduction and credit may be taken only with respect to property for which a depreciation allowance is allowable. Sections 179(d)(1)(A); 48(a)(1). [4]
An activity not engaged in for profit is defined in section 183(c) as one for which deductions under sections 162 and 212(1) and (2) are not allowable. In deciding whether an activity is described in section 183, the focus *135 is on the objective with which the taxpayer entered into and engaged in the activity. If the taxpayer had a bona fide, even though unreasonable, objective of making a profit, the activity is not described in section 183. Jasionowski v. Commissioner, 66 T.C. 312 (1976); section 1.183-2(a), Income Tax Regs. The determination of the taxpayers' intent is to be based on all the facts and circumstances, with greater weight placed on objective facts than on the taxpayer's statement of intent. Churchman v. Commissioner, 68 T.C. 696, 701 (1977). Section 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regulations, lists some of the factors which normally are taken into account in a section 183 determination. Allen v. Commissioner, 72 T.C. 28, 33 (1979). Our decision that the aircraft rental operation was an activity not engaged in for profit is founded upon a combination of these factors: the consistent and sizeable losses, the limited time and effort devoted by petitioners to the activity, the non-businesslike manner which characterized the *136 commencement of the rental activity, petitioners' substantial income from other sources and the personal and recreational elements of ownership and operation of the aircraft. From 1976 to 1978 the partnership suffered a series of losses. [5] Continued losses, of course, do not, in themselves, require a conclusion that the activity was one not engaged in for profit. See Engdahl v. Commissioner, 72 T.C. 659 (1979); Allen v. Commissioner, supra.A series of losses during the initial or start-up stage of an activity is not necessarily an indication that profit motivation is absent. Section 1.183-2(b)(6). However, petitioners introduced no evidence to demonstrate that it is customary or necessary in the aircraft rental business to suffer losses for three years to build a profitable business. Indeed, as petitioner Richard Akers stated at trial, the reason that the partnership incurred losses was because too few people were renting the partnership aircraft. Where, as here, petitioner spent a minimal amount of time marketing the partnership aircraft, the *137 continuous and increasing stream of losses indicates the lack of a profit objective in conducting the operation. The extent of the losses and the limited time and effort devoted by petitioners to the activity are more striking as evidence of the lack of a profit objective when the aircraft leasing activity is compared with petitioners' other business pursuits. Drs. Akers and Hamrick conduct successful medical and dental practices, respectively. These practices absorbed the bulk of their time. Nonetheless, they devoted sufficient time and effort to investigate and to conclude the development of a waterslide amusement during 1976-1977. The effort and success which accompanied petitioners' other business activities contrast with the results of the aircraft *138 leasing operation. This contrast indicates that petitioners did not enter the rental business with the objective of starting a profitable business. See section 1.183-2(b)(3)-(8), Income Tax Regs.
Petitioners' conduct of the rental operation demonstrates that it was not carried on in a business-like manner. The partnership maintained separate books and had its own checking account. However, the failure to advertise in the telephone book or other media and the limited nature of personal contact advertising conducted by petitioners demonstrate a non-business-like manner of operation. Also, the partnership did not require a minimum use by customers when they rented the aircraft. Consequently, the aircraft could be tied up for days and the partnership would receive only a minimal amount of income. For example, the partnership aircraft was utilized for 14 days during one period of 1976, yet, the partnership received rentals for only 4.1 flight hours. Fixed-base operators, such as Air Services, Inc., utilize a minimum use policy in conjunction with the rental of aircraft which they own. At trial, James Brugh, President of Air Services, Inc., testified that his company would object *139 to renting one of their planes for 14 days if the customer would only pay for 4.1 hours of flight time. In addition, the partnership used aircraft which had a limited rental market in the Greensboro-High Point area. The Cessna C210L and Beechcraft Bonanza airplanes were sophisticated aircraft which were complicated and expensive to operate. These characteristics made these airplanes suitable for an air taxi business but made it unlikely that they would be in high demand in the rental market. Of course, evidence of poor business decisions does not, in itself, render the activity one not engaged in for profit. But using aircraft which had a limited rental market is evidence that petitioners did not enter the aircraft rental business to make a profit, particularly when, as here, petitioners used minimal effort to develop a customer bare for the rental business. The fact that petitioners derived substantial income from sources other than aircraft rentals (i.e.: their medical and dental practices) indicates that they may not have entered the activity with the requisite profit motive, especially where, as here, personal or recreational elements are present. Section 1.183-2(b)(8), Income Tax Regs. *140 Drs. Akers and Hamrick enjoyed flying and they made substantial use of the partnership aircraft for personal business and recreation. These factors indicate that the doctors entered the rental activity to defray and to deduct a portion of their personal aircraft expenses. [6]
Drs. Akers and Hamrick argue that the succession of changes which they implemented in the rental operation indicates that they were in business to make a profit and attempted to improve profitability. See section 1.183-2(b)(1). [7] Petitioners identify the increase in the hourly rental rate in 1976, acquisition of the Beechcraft Bonanza in 1976, negotiation and execution of the leaseback arrangement with Air Services, Inc., during 1977-1978 and acquisition of the Beechcraft Baron in 1978 as evidence of their intent to increase revenues by abandoning unprofitable methods of operation. Changing the mode of operation to increase profitability is a factor which indicates a profit motive. *141 Allen v. Commissioner, 72 T.C. 28, 35 (1979). But increasing the rental rate and acquiring the faster Bonanza airplane is consistent also with the view that petitioners sought to defray and to deduct a portion of their personal flying expenses. Drs. Akers and Hamrick claim that the personal elements which they derived from flying were satisfied in using a Cessna C210L. Therefore, they argue, the purchase of the Bonanza with its additional speed and better instrumentation indicates their profit motivation. At trial, however, petitioner Akers stated that the Bonanza's all weather capability and superior instrumentation made the Bonanza a more useful airplane than the Cessna for his personal use. Petitioners failed to convince us that the purchase of the Bonanza was not for the personal satisfaction of owning a better aircraft and for personal business reasons. At any rate, increasing the rental rate and purchasing the Bonanza as changes in the mode of operation do not convince us that petitioners were engaged in the business to make a profit because, at least during 1976 and 1977, petitioners failed to alter other facets of business operations, such as marketing, *142 which could have increased revenues. Entering the leaseback arrangement and the purchase of the Baron in 1978 may indicate an attempt at that time by the partnership to make a profit. The leaseback arrangement utilizes the fixed-base operator's established marketing capability and utilizes the aircraft in air taxi operations, for which a greater market exists than exists for rental of the partnership aircraft. However, these changes in 1978 do not convince us that petitioners were profit motivated in 1976. The limited time and effort devoted to the business despite sizeable losses, the non-business like manner of operations which characterized the commencement of the activity, petitioners' substantial income from other sources and the personal and recreational aspect of ownership and operation of the aircraft convince us that the aircraft rental operation was an activity not engaged in for profit. Petitioners argue that the business-like manner which characterized the relationship between the partnership and the partners requires a contrary result. However, this aspect of the rental activity is only one factor in the section 183 analysis and it does not outweigh the prior considerations. *143 Petitioners also claim that they entered the rental business and made changes in operations based upon expert advice. Reliance on expertise is a factor which may indicate a profit motive. Section 1.183-2(b)(2), Income Tax Regs. Although we believe that petitioners contacted personnel involved in aviation when they purchased the airplane and when they negotiated the leaseback agreement with Air Services, Inc., the record does not support the claim that they consulted experts concerning the problems facing the partnership and relied on their advice. Even if it is assumed that petitioners contacted experts it is doubtful that they followed the advice they would have offered. At trial petitioners called James Brugh, President of Air Services, Inc., who testified that the Cessna and Bonanza aircraft used by the partnership had a limited rental market in the Greensboro-High Point area and that these airplanes could better be employed in air taxi operations. Petitioners' use of these aircraft in a rental operation in 1976 without devoting substantial effort to develop *144 a marketing capability indicates that petitioners did not rely on expertise. Waterslide Expenditures
Drs. Akers and Hamrick retered the waterslide amusement business in 1976 and investigated several sites in making the decision where to locate the amusement. Petitioners claim that they are entitled to a loss deduction for the expenditures allocable to the sites which were not developed. [8]
The costs of entering and developing a business are capital in nature and are not expenses which are deductible immediately. But when a business is unsuccessful and abandoned the amounts *145 spent in forming the business are deductible as a loss under section 165(c). Seed v. Commissioner, 52 T.C. 880 (1969). Respondent does not dispute that the amounts which petitioners seek to deduct were incurred in the formation of a business. Contrast Frank v. Commissioner, 20 T.C. 511 (1953). Respondent contends, however, that the business was successful and that no loss deduction should be allowed. Petitioners claim that each site which was investigated represented a separate joint venture. Thus, argue petitioners, when it was decided not to develop the sites other than Wildwood, New Jersey, an abandonment of the other joint ventures occurred, entitling them to a loss deduction for that portion of the expenses. There is no evidence in the record that petitioners comtemplated separate joint ventures for each potential site. Indeed, the record suggests that petitioners intended to construct only one waterslide amusement and that they reviewed several sites to determine the best one. The waterslide amusement business was successful.Petitioners established a corporation in 1977 which developed and operated a waterslide amusement in Wildwood, *146 New Jersey. Petitioners have the burden of proving that an abandonment of a business occurred with respect to the sites which were not developed. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners failed to satisfy the burden concerning this issue. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect for the year in question.↩
1a. Peggy H. Akers and Mary W. Hamrick are petitioners in this case solely because they filed joint returns with Richard Akers and John Hamrick, respectively. Hereinafter, reference to "petitioners" means reference to Richard Akers and John Hamrick.↩
2. In the air taxi business, a fixed base operator, like Air Service, Inc., furnishes the pilot and the aircraft to the customer. Federal regulations prescribe high standards for maintenance, operational procedures and personnel.↩
3. The relevant portions of section 183 are: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason for paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
4. See also, Worley v. Commissioner, T.C. Memo. 1980-51↩ (investment credit on property used in an activity not engaged in for profit disallowed).
5. Evidence of the conduct of an activity during years subsequent to the year in issue is relevant to a determination of whether petitioners had the requisite profit motive in 1976. Abrams v. United States, 449 F.2d 662, 663 (2d Cir. 1971); Bessenyey v. Commissioner, 379 F.2d 252, 254 (2d Cir. 1967), affg. 45 T.C. 261 (1965), cert. denied, 389 U.S. 931↩ (1967).
6. See Worley v. Commissioner, T.C. Memo. 1980-51↩.
7. Contrast Worley, supra↩.
8. The relevant portions of section 165 are: SEC. 165. LOSSES. (a) GENERAL RULE.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) LIMITATION ON LOSSES OF INDIVIDUALS.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business;↩